UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RICHARD KEVIN STEIGER,

                    Plaintiff,                        Case No. 15-cv-12627

v.                                         Honorable Thomas L. Ludington

ROBERT HAHN, et al,

                    Defendant.

_____/

**<u>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DISMISSING PLAINTIFF'S FEDERAL CLAIMS WITH PREJUDICE,
AND DISMISSING PLAINTIFF'S STATE COURT CLAIM WITHOUT PREJUDICE</u>**

Plaintiff Richard Kevin Steiger brought suit against the Defendants on July 27, 2015.[1] Compl., ECF No. 1. The suit alleges five counts: unreasonable seizure without probable cause, malicious prosecution, first amendment retaliation, gross negligence, and violation of Fourteenth Amendment due process rights. *Id.* at 16–23. Steiger contends that the Defendants, a variety of law enforcement officers who investigated whether Steiger fraudulently obtained prescription drugs, maliciously investigated and prosecuted him because he had criticized Defendants' conduct and procedures. *Id.* At the close of discovery, Defendants filed a motion for summary judgment. ECF No. 43. For the reasons stated below, Defendants' motion will be granted.

**I.**

Plaintiff Richard Steiger is the County Prosecutor for Presque Isle County. Steiger Test. at 82, ECF No. 50, Ex. A1. Steiger married his now ex-wife in 1994. Kirah Steiger Test. at 11, ECF No. 50, Ex. A3. The two separated in 2005 and divorced in 2006. *Id.* at 11–12. Defendant

---

[1] Steiger previously filed an action against many of the same Defendants on October 24, 2014. *See Steiger v. Hahn* (*Steiger I*), Case No. 14-14110. That suit was dismissed voluntarily and without prejudice on May 6, 2015.

Michael A. Caldwell is Inspector-Assistant Commander of the Seventh District for the Michigan State Police (MSP). Caldwell Aff., ECF No. 44, Ex. 30. Defendant Patrick Boyd is a supervisor with the Michigan State Police who is assigned to the Seventh District Task Force. Boyd Aff., ECF No. 44, Ex. 27. Defendant Delmer Putnam is a retired Michigan State Police detective-lieutenant. Putnam Aff. ECF No. 44, Ex. 7. In late 2011 and early 2012, Putnam was assigned to and commanded the Huron Area Narcotics Team (HUNT). *Id.* Defendant Ken Mills, Jr., is a detective-lieutenant assigned to Straights Area Narcotics Enforcement (SANE). Mills Aff., ECF No. 44, Ex. 11. Defendant Bradley Szatkowski is a police officer employed by the Presque Isle Sheriff's Department. Compl. at ¶ 8. Defendant Alan Burke retired from the Michigan State Police in February 2012. In late 2011 and early 2012, Burke was a trooper assigned to the Alpena MSP post.

### A.

Steiger's allegations regarding his history of medical issues and pain management are uncontested. Steiger underwent a nasal surgery in 1993. Compl. at ¶ 25. That surgery was mishandled and resulted in Steiger facing "continuous pain and discomfort" as well as chronic "sinusitis and migraine headaches." *Id.* On September 11, 2011, Steiger underwent outpatient surgery at the Alpena Regional Medical Center for treatment of "a substantial gluteal abcess." *Id.* at ¶ 27. Steiger was prescribed pain relievers for the pain resulting from the surgery. *Id.* at ¶ 28.

Because Steiger was undergoing medical treatment for the abcess, he asked his ex-wife, Kirah Steiger, to take care of their children for several days while he recovered. *Id.* at ¶ 29. Kirah agreed and took the children to Steiger's home so they could collect their belongings. *Id.* at ¶ 30. Because Ms. Steiger was suspicious that Steiger was abusing pain medication and because she was concerned for her children, she searched Steiger's home for medication. Kirah Steiger Test.

at 15–17. Ms. Steiger discovered two bottles of medication and a bottle that contained white powder. *Id.* at 16. She took the bottle containing the powder without informing Steiger or seeking his permission. *Id.* at 33.

After the search, Ms. Steiger contacted HUNT, a multi-jurisdictional task force that investigated narcotics offenses in the area and operates under MSP oversight. *Id.* at 22; Hahn Aff. at 1, ECF No. 43, Ex. 3. Steiger was a member of the HUNT board of directors at the time. Hahn Aff. at 2. Ms. Steiger contacted Defendant Burke, who gave her the contact information for Detective Hahn. Kirah Steiger Test. at 20–21. Ms. Steiger then met with Hahn on September 14, 2011. *Id.* at 21–22. She gave Hahn the substance she had taken from Steiger's home. *Id.* at 35. Ms. Steiger informed Hahn that she believed the substance was ground up Percocet and that Steiger was getting prescriptions for narcotic pain medication from multiple doctors. Kirah Steiger Interview I at 5–7, ECF No. 43, Ex. 5. Hahn indicated he would run a MAPS report[2] and wondered whether Steiger was doctor shopping. *Id.* at 22. Ms. Steiger responded: "He is, yeah. He is doctor shopping. It's going to be Kiel and Coombs." Hahn then replied: "But two doctors isn't—I mean, yes, there could—you can have a problem there, particularly if you are . . . playing them off of each other, but typically a good doctor shopping case would require at least three, four, maybe five, and that could be." *Id.* at 22–23. Hahn kept the bottle of Percocet and initiated a criminal investigation into Steiger's prescription drug use. Ms. Steiger and Hahn met again on September 23, 2011, and Ms. Steiger agreed to become a confidential informant. Kirah Steiger Test. at 38–39.

**B.**

---

[2] "The Michigan Automated Prescription System (MAPS) is the prescription monitoring program for the State of Michigan." See Michigan Automated Prescription System (MAPS), http://www.michigan.gov/lara/0,4601,7-154-72600_72603_55478---,00.html. The system helps "identify and prevent drug diversion at the prescriber, pharmacy and patient levels by collecting Schedule 2-5 controlled substances prescriptions dispensed by pharmacies and practitioners." *Id.*

On September 20, 2011, Detective Szatkowski ran a MAPS report for Steiger at Hahn's direction. Incident Rep. at 1, ECF No. 43, Ex. 4. Hahn summarized the report:

> The M.A.P.S. report revealed that in the year 2010, Steiger was issued a total of 1,840 units of Oxycodone/Oxycontine of varying milligram strengths and consistencies, as well as 2,075 units of Hydrocone of varying milligram strengths and consistencies. In the year 2011, the amounts were 1,868 units of Oxycodone/Oxycontine and 650 units of Hydrocone. Based upon the enormous amounts of Hydrocone and Oxycodone/Oxycontine being prescribed to Steiger in the last two years, it is unlikely that the prescribing physicians involved in Steiger's medical treatment are aware of one-another. Or, at the very least, are aware that the others are prescribing controlled substances to him in addition to that which they are prescribing.

*Id.*

Hahn further highlighted seven specific periods of time where Steiger obtained multiple prescriptions for similar or identical drugs within a short period of time and from different doctors. *Id.* at 3–5.

On September 26, 2011, HUNT turned over the investigation to SANE, another multi-jurisdictional narcotics task force that typically conducts investigations in nearby counties. Hahn Aff. at 2. The investigation was transferred because Steiger was a prosecuting attorney in one of the counties covered by HUNT and because Steiger was on HUNT's board of directors. *Id.* Detective Mills led the investigation for SANE. Mills Test. at 74–75, ECF No. 50, Ex. A2. At Mills's request, HUNT officers assisted SANE in the investigation by executing search warrants and interviewing witnesses. *Id.* at 77–78.

On October 3, 2011, Assistant Attorney General Richard Cunningham sent a letter to Dr. Kirk C. Mills at Detroit Receiving Hospital which included Steiger's MAPS report. Cunningham Letter, ECF No. 50, Ex. R. In the letter, Mr. Cunningham requested that Dr. Mills provide an "expert medical opinion" on whether "there is probable cause to believe that a person's medical records will provide evidence that a crime has occurred." *Id.* at 1. Mr. Cunningham explained

that the investigators were working under the theory that if there were no notes on the medical records indicating that Steiger informed his doctors he was receiving other prescriptions, that "would be evidence that the patient never told the provider about any other prescriptions." *Id.* at 2. Mr. Cunningham asked Dr. Mills whether it was "likely that any physician would have prescribed the controlled substances prescribed by other physicians so close in time." *Id.*

On October 22, 2011, Dr. Mills reported his findings. Mills. Rep., ECF No. 50, Ex. S. Dr. Mills concluded that Steiger's "pattern of obtaining pain medication from two different physicians and using multiple pharmacies to get them filled it [sic] is completely consistent with drug abuse, misuse, or diversion." *Id.* at 3. Further, Dr. Mills explained that Steiger's "pattern of obtaining medications earlier than predicted based on the quantity described is consistent with drug misuse, abuse, and/or diversion." *Id.* Dr. Mills asserted that Steiger should have had dozens, if not hundreds, of unused pain tablets left over because of the frequency with which his medication was changed, and that "[l]egitimate chronic pain patients typically inform their prescribing physician that they still have tablets left over." *Id.* Finally, Dr. Mills explained that both of Steiger's doctors "over prescribed pain medication" and that it was likely that neither checked Steiger's MAPS records. *Id.* at 4. Dr. Mills also explained that there "were obvious oversights by some of the pharmacies utilized" by Steiger. *Id.* On January 24, 2012, Dr. Mills sent a notarized letter to Mr. Cunningham attesting that his medical expert opinion in the October 22, 2011, letter was entirely the result of Dr. Mills's "own independent study and analysis." Mills Letter, ECF No. 43, EX. 14.

## C.

Investigators then prepared search warrants for eleven medical facilities and pharmacies, including the medical offices of Dr. Robert Coombs and Dr. Jeffrey Kiel, the two doctors who

prescribed almost all of Steiger's pain medication. Mills Sept. 26, 2011, Rep. at 5, ECF No. 50, Ex. U.

On October 25, 2011, Mills and Detective Rundstrom interviewed Dr. Kiel. Kiel Interview I, ECF No. 50, Ex. B. Dr. Kiel informed the officers that Steiger had informed him he was receiving Oxycontine prescriptions from another doctor. *Id.* at 8. According to Dr. Kiel, he recommended that Steiger begin treatment at a pain clinic, which resulted in Steiger's relationship with Dr. Coombs. *Id.* at 10. However, Dr. Kiel did not know that Steiger was receiving Oxycodone and Percocet from Dr. Coombs. *Id.* at 11, 17. Dr. Kiel had not run a MAPS for Steiger. *Id.* at 9. Although Dr. Kiel was surprised that Steiger was receiving so much medication from Dr. Coombs, Dr. Kiel admitted that he likely did not document whether Steiger misrepresented his prescriptions from Dr. Coombs. *Id.* at 16–17. However, Dr. Kiel did suggest that Steiger "probably [has] got a problem and it looks like it's getting the better of him." *Id.* at 15.

While Dr. Kiel was interviewed, Hahn and Putnam simultaneously questioned Dr. Coombs. Coombs Interview I, ECF No. 50, Ex. D. When asked whether he was aware that Steiger was seeing other doctors, Dr. Coombs indicated he was not. *Id.* at 3. Dr. Coombs further explained that if he had learned that Steiger was getting prescriptions from other physicians, he would have discharged Steiger from his practice. *Id.* Dr. Coombs indicated that all of his patients sign a contract with him in which they promise not to "attempt to obtain any controlled medicines . . . from any other doctor." *Id.* at 6–7. The officers asked whether Dr. Coombs had ever run a MAPS on Steiger, and Dr. Coombs indicated that his office had not, likely because Steiger was a prosecuting attorney. *Id.* at 3–4. After the officers showed him Steiger's MAPS report, Dr. Coombs indicated that the behavior on the report would typically be grounds for

discharging a patient from the practice and that he would no longer provide prescriptions for Steiger. *Id.* at 5. Dr. Coombs further explained that "I don't even think I've had people I have kicked out that have been this bad." *Id.* at 5. However, Dr. Coombs did admit that he likely did not ask Steiger whether he was receiving narcotics from other doctors. *Id.* at 7. Dr. Coombs indicated that he did not even have suspicions that Steiger might be obtaining prescriptions elsewhere. *Id.* at 7–8.

Also on October 25, 2011, Mills and Detective Rundstrom interviewed Steiger at his home. Steiger Interview, ECF No. 43, Ex. 18. Steiger was shocked by the allegations and fiercely disputed the assertion that he was doctor shopping or defrauding his doctors. *Id.* He asserted that Dr. Kiel was his primary care physician, that Dr. Coombs was his pain care physician, and that both were aware of what the other was prescribing. *Id.* He firmly denied addiction. *Id.*

Finally, Mills, Putnam, Caldwell, Presque Isle County Sheriff Paschke, and a Presque Isle County assistant prosecutor met on October 25, 2011, to discuss the status of the investigation. Mills. Test. at 78, ECF No. 50, Ex. A2. Mills indicated to the group that he thought the case against Steiger was weak. *Id.* at 78–79. However, Mills later testified that the case became stronger after medical records were obtained and Steiger's doctors were further interviewed. *Id.* at 79–80.

On October 31, 2011, Dr. Coombs was interviewed again by Hahn. Coombs Interview II, ECF No. 50, Ex. F. The two discussed Dr. Coombs medical records relating to Steiger's treatment. Although both Dr. Coombs and Hahn had difficulty deciphering the records, they agreed that the records indicated that Steiger had disclosed at least some of the medication he was receiving from Dr. Kiel. *Id.* at 3–4; Medical Records from Coombs at MSP00112–161, ECF

No. 50, Ex. P. The two agreed that, although Steiger had disclosed that Dr. Kiel was prescribing Narco to him, he did not disclose Dr. Kiel's Percocet prescriptions. Coombs Interview II at 24. Dr. Coombs asserted that he had told Steiger to stop taking some of the pain medication was receiving from Dr. Kiel. *Id.* at 5. He further told Steiger to stop getting Norco and Percocet, two controlled pain medications, from Dr. Kiel. *Id.* at 7. Dr. Coombs never expressly authorized Steiger to obtain duplicate prescriptions of pain medication from Dr. Kiel. *Id.* at 13. In fact, Dr. Coombs indicated that if he had realized Steiger was getting similar medication from two sources, he would have quickly put a stop to it. *Id.* at 18. Finally, Dr. Coombs recounts a conversation he had with Steiger after the allegations of fraud arose. Coombs Interview 2 at 39–40, ECF No. 43, Ex. 16. In that conversation, Steiger told Dr. Coombs that he had made full disclosure. *Id.* Dr. Coombs responded by saying: "'It's not full disclosure when you get a medication from me and then you go to another doctor and you get the identical medication.'" *Id.*

On November 14, 2011, Mills interviewed Physician's Assistant Jeffery Kwiatkowski, who prescribed twenty Percocet pills to Steiger during an emergency room visit in September 2011. Kwiatkowski Interview, ECF No. 43, Ex. 19. Kwiatkowski indicated that he had not run a MAPS report for Steiger, but believed that doing so was unnecessary because Steiger was a prosecuting attorney and had reasons for his pain complaints. *Id.* at 6–7. Kwiatkowski further indicated that Steiger disclosed that he was receiving pain medication from other doctors, but did not disclose the amounts. *Id.* at 8. Kwiatkoswki said he likely would not have prescribed additional Percocet if he knew the amount of pills Steiger had already been prescribed. *Id.* at 6, 12.

Also on November 14, 2011, Mills interviewed Dr. Kiel for a second time. Kiel Interview II, ECF No. 43, Ex. 20. Dr. Kiel told Mills that Steiger "did misrepresent himself" on at least one

occasion because "there is no way [Dr. Kiel] would have given" additional medication so soon after Steiger received similar medication from Dr. Coombs. *Id.* at 13. According to Dr. Kiel, Steiger would consistently ask for refills of his prescriptions early. *Id.* at 15–37. Further, Dr. Kiel asserted that, even though Steiger had disclosed that he was getting prescriptions from another doctor, Steiger was "being deceptive." *Id.* at 53. Steiger told Dr. Kiel that Dr. Coombs had authorized Dr. Kiel to prescribe pain medication for Steiger's migraines. *Id.* at 64. Dr. Kiel accepted Steiger's representation and thus prescribed pain medication without talking independently with Dr. Coombs. *Id.* Dr. Kiel now admits that not independently confirming Steiger's prescriptions and treatment plan with Dr. Coombs was a mistake. *Id.* at 88.

### D.

On December 16, 2011, Putnam and Mills met with members of the Attorney General's office, including Richard Cunningham. Jan. 4, 2012 Supp. Rep at MSP00045, ECF. No. 43, Ex. 4. There is dispute over whether Mr. Cunningham or the investigators requested the meeting. At the meeting, Mr. Cunningham told the investigators that the Attorney General's office would review the findings and determine whether to file charges. *Id.* On December 18, 2011, Mr. Cunningham told Mills that Steiger would be charged with one count of obtaining prescription narcotics by fraud. *Id.* On December 19, 2011, Mills sent an email to Mr. Cunningham requesting an arrest warrant for Steiger. Email, ECF No. 50, Ex. G. Daryl Vizina, the elected prosecutor for Cheboygan County, asserts that Mills told him after Steiger's arrest that Mills was surprised the charges had been brought because it was not "a great case." Vizina Aff. at 3, ECF No. 50, Ex. J. On December 21, 2011, Hahn sent a letter to Mr. Cunningham which followed up on the meeting. Hahn Letter, ECF No. 50, Ex. H. In the letter, Hahn stated that "the sensitive nature of this investigation is quite the departure from our normal routine here in North Eastern

Michigan, and when made public, will have a negative impact on the public's faith in Mr. Steiger's office. I believe that this impact will be short-lived and that the citizens of Presque Isle County will one day . . . be thankful that Mr. Steiger's actions were uncovered." *Id.*

On January 24, 2012, and February 2, 2012, a preliminary examination was conducted in the 88th District Court. Judge Theodore Johnson asserted that although Steiger had obtained a tremendous amount of pills over the period of time in question, he was not charged with prescription drug abuse. Prelim. Ex. Tr. at 127, ECF No. 50, Ex. A7. Rather, he was charged with fraudulently obtaining prescriptions. *Id.* Judge Johnson concluded that Mr. Steiger did not make misrepresentations to his physicians. *Id.* at 128. Rather, every time Steiger saw Dr. Coombs, he filled out a form indicating he was receiving medication from another doctor. *Id.* Likewise, Dr. Kiel knew that Dr. Coombs was prescribing pain medication. *Id.* at 128–29. Accordingly, Judge Johnson found that the government had not shown probable cause of fraud sufficient to bind the case over for trial. *Id.* at 129.

The state appealed the district court's decision. On May 17, 2012, Circuit Judge Michael G. Mack denied the prosecution's appeal. Circuit Court Op., ECF No. 44, Ex. 25. He reasoned that fraud can be both actual and constructive. *Id.* at 7. Accordingly, the question was whether Steiger had shielded himself from criminal liability by disclosing his treatment regimen. *Id.* Judge Mack admitted that there was ambiguity as to whether a constructive fraud theory would justify binding over the matter for trial, but found that, under an abuse of discretion standard, there was no reason to "second-guess the determination of the district court." *Id.* In fact, Judge Mack reasoned that "to put him in criminal jeopardy would be to effectively hold him criminally accountable for his physician's negligent review of his medical records." *Id.* at 8. He further found that the conclusory statements by Dr. Coombs and Dr. Kiel were self-serving. *Id.*

**E.**

Steiger contends that the case was investigated and prosecution was brought in this case because he had criticized HUNT officers, including Caldwell, Hahn, Boyd, and Putnam, for engaging in unlawful actions. Steiger Aff., ECF No. 50, Ex. W. Specifically, Steiger believes that Caldwell retaliated against Steiger because Steiger publically alleged that Caldwell improperly pressured investigators to close an investigation into whether Caldwell's son was guilty of home invasion and criminal sexual conduct. *Id.* at 3. An internal affair investigation was made into Steiger's allegation that Caldwell had improperly influenced the investigation into the allegations made against Caldwell's son. Internal Affairs Rep., ECF No. 44, Ex. 31. The report concluded that the case was properly closed because none of the victims wanted to pursue charges. *Id.* at 3. Steiger has also criticized Hahn because, in Steiger's opinion, HUNT officers were inappropriately intimidating suspects, releasing deceptive press releases, and requesting Steiger to prosecute blatantly unconstitutional cases. Steiger Aff. at 3.

**II.**

Now before the Court is Defendants' motion for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

Defendants have moved for summary judgment on each count of Plaintiff's complaint. Plaintiff is bringing four claims pursuant to 42 U.S.C. § 1983 and one state law claim. First, Steiger alleges that he was arrested without probable cause in violation of the Fourth Amendment. He also asserts that he was the subject of a malicious prosecution in violation of the Fourth Amendment. Third, he argues that Defendants' actions constituted First Amendment retaliation against him for his criticism of them. Fourth, he alleges that Defendants' actions deprived him of his Fourteenth Amendment due process rights. Steiger finally brings a state law claim for gross negligence. Defendants argue that they are entitled to judgment on each claim because of their qualified immunity.

"A plaintiff proceeding under § 1983 must establish that a person acting under color of state law deprived him of a right secured by the Constitution or by federal law." In the specific context of § 1983 actions, the non-moving party "must demonstrate a genuine issue of material fact as to the following two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) that the deprivation was caused by a person acting under color of state law. *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quotations and citations omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818, (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id*. at 243-44.  "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id*. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "The Fourth Amendment conditions warrants on probable cause and prohibits unreasonable seizures. A police officer violates those restrictions only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause."  *Newman v. Twp. of Hamburg*, 773 F.3d 769, 771-72 (6th Cir. 2014). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## 1.

Defendants first argue that the investigating officers did not violate any of Steiger's Fourth Amendment rights. They assert that probable cause was not so obviously lacking as to overcome Defendants' qualified immunity and that Steiger likewise cannot overcome qualified immunity as to the malicious prosecution claim.

"Probable cause requires only the probability of criminal activity[,] not some type of 'prima facie' showing." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988). The probability of criminal activity, in turn, is assessed under a reasonableness standard based on "an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). It is viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (quotations and citation omitted).  Probable cause to arrest therefore requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Furthermore, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id*. at 36.

Steiger was charged under M.C.L. § 333.7403a(1), which provides that a "person shall not fraudulently obtain or attempt to obtain a controlled substance or a prescription for a controlled substance from a health care provider." There is no dispute that Steiger obtained prescriptions for controlled substances from several healthcare providers. The only question was whether he did so fraudulently. Thus, to overcome Defendants' qualified immunity, Steiger must demonstrate that a reasonable officer could not have believed the evidence created probable cause to believe that Steiger engaged in fraudulent behavior, in light of the clearly established law and information revealed by the investigation. *See Anderson v. Creighton*, 483 U.S. 635, 641

(1987). Even construing the facts in a light most favorable to Steiger, a reasonable officer could have concluded that probable cause existed.

To begin with, the mere fact that the prosecution was not bound over to trial for lack of probable cause is insufficient to overcome Defendants' qualified immunity. As already stated, the existence of probable cause must be determined without the benefit of hindsight. Simply because Judge Johnson determined at the preliminary hearing that probable cause was not present does not mean that no reasonable officer could have concluded that probable cause existed. On the contrary, there is sufficient evidence to conclude that probable cause was present.

First, Dr. Mills submitted a letter to the Attorney General's office which concluded that Steiger's MAPS report contained significant evidence of wrongdoing. Dr. Mills indicated that Steiger's pattern of obtaining prescriptions as well as the number of pills involved was "completely consistent with drug abuse, misuse, or diversion." Mills Rep. at 3. The clear implication of Mills's report is that the doctors and pharmacies involved would have ceased prescribing pain medication if they had been aware of each other. And even though the doctors involved may have been negligent, Mills's report also asserted that a "legitimate" pain patient would have informed his prescribing physician about the vast amounts of pills being prescribed elsewhere. *Id.* Dr. Mills is an independent medical expert retained by the Attorney General's office. Steiger has not alleged that his opinion was based on malice or retaliation. Thus, Mills's report provides at least some evidence that Steiger had been involved in fraudulent behavior.

Likewise, both Dr. Kiel and Dr. Coombs expressed surprise when they learned about the number of prescriptions Steiger had received. Even though both admitted that Steiger had disclosed the fact that he was receiving prescriptions elsewhere and that they should have checked his MAPS report, they also indicated that Steiger did not disclose the specific amounts

and type of pills being prescribed elsewhere. *See* Coombs Interview II at 18, 24; Kiel Interview II at 13, 53. Both interviews make clear that the physicians would not have continued prescribing pain medication if they had known exactly how many pills Steiger had received. Even if these statements were self-serving, they still further supported the conclusion Steiger was defrauding his physicians.

Steiger makes much of the comments that he alleges Mills made about the apparent weakness of the case. *See* Mills Test. at 78; Vizina Aff. at 3. He asserts that this uncertainty about the strength of the case indicates that probable cause was absent. But the ultimate decision regarding whether to bring the case was made by the Attorney General's office, which is not a defendant. Jan. 4, 2012, Supp. Rep. at MSP00045. Steiger has not alleged that the Attorney General's office has any reason to spitefully or maliciously bring a suit against him. Thus, the Attorney General Office's independent determination that probable cause existed is strong evidence that there was sufficient evidence for a reasonable officer to believe probable cause existed. Steiger argues that Defendants withheld exculpatory evidence from the Attorney General's office, including Steiger's medical records. In support, Steiger cites to Mills's email on December 19 in which he promises to mail copies of Steiger's medical records. Email, ECF No. 50, Ex. G. But even if the Attorney General's office did not receive the medical records until after December 19, 2011, there is no evidence that those records were not turned over to and reviewed by the Attorney General's office before Steiger was informed of the charges on December 27, 2011.

Finally, Steiger argues that there was no probable cause because his medical records showed that he consistently disclosed his treatment with other physicians. But, even construing the medical records in a light most favorable to Steiger, they did not completely foreclose the

possibility of fraudulent behavior. Dr. Mills, Dr. Coombs, and Dr. Kiel all asserted that no physician with total knowledge of the situation would have continued prescribing pain medication to Steiger. Judge Mack determined that the Dr. Coombs's and Dr. Kiel's negligent review of Steiger's medical records resulted in their lack of knowledge of his prescription history. Circuit Court Op. at 8. Judge Mack admitted that the state might be relying on a constructive fraud theory: "something like, Defendant knew that his controlled substance regimen would not be closely scrutinized by his physicians and he took advantage of that by not aggressively questioning their prescribing recommendations." *Id.* at 7. Judge Mack was skeptical of that theory, but also indicated that there was "'ambiguity'" regarding whether this type of behavior constituted fraud and that whether Defendant's behavior was criminal was "murky." *Id.* at 7–8. Judge Mack concluded that under the deferential standard of review and rule of lenity, the district court's dismissal of charges should be affirmed. *Id.* at 8. But Judge Mack's discussion about whether the constructive fraud theory was sufficient to establish a violation of the statute demonstrates that the law in this area was not clearly established. The theory regarding how Steiger engaged in fraud might not have been likely to succeed, but it could still have been reasonably brought. Because the determination of whether probable cause existed is not dependent on the outcome of the eventual prosecution, the mere fact that the prosecution's theory of fraudulent behavior was ultimately rejected does not eliminate Defendants' qualified immunity.

In short, there was sufficient evidence that Steiger had fraudulently obtained prescriptions drugs for Defendants to reasonably investigate the case and submit it to the Attorney General's office. The Attorney General Office's independent review and determination that probable cause to charge existed is further indication that a reasonable officer could have concluded that

probable cause existed. Finally, the mere fact that the case was dismissed for lack of probable cause is not determinative of whether the Defendants acted unreasonably. Rather, Judge Mack's discussion of a possible theory of probable cause indicates that a reasonable, if dubious, argument that Steiger violated the statute existed. Viewing the facts at the time Defendants submitted the case to the Attorney General in a light most favorable to Steiger, Defendants' actions were not "plainly incompetent" or a knowing violation of the law. *Malley*, 475 U.S. at 340. Thus, Defendants are protected by qualified immunity from Steiger's claim that they violated his Fourth Amendment rights by arresting him without probable cause.

Similarly, because Steiger cannot show that probable cause was so clearly missing as to make the investigation unreasonable, he cannot establish a claim for malicious prosecution. A claim of malicious prosecution is distinct from a claim of false arrest in that the malicious prosecution claim "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Wallace v. Kato*, 549 U.S. 384, 390, (2007). A plaintiff raising a malicious prosecution claim must satisfy the following four elements: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) probable cause for the prosecution was lacking; (3) the plaintiff suffered a deprivation of liberty under the Fourth Amendment as a consequence of the legal proceeding; and (4) the criminal proceeding resolved in the plaintiff's favor. *See Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010).  Under the first prong, a defendant need not have actually made the decision to prosecute to be held liable for malicious prosecution.  Instead, the Sixth Circuit has determined that law enforcement officers may be held liable for malicious prosecution if they influence or play a role in the criminal process. *Id.* at 311-12.

As set forth above, "[t]he Fourth Amendment conditions warrants on probable cause and prohibits unreasonable seizures. A police officer violates those restrictions only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman*, 773 F.3d at 771-72.

Because, as discussed above, a reasonable officer could have concluded that probable cause to charge Steiger existed, Steiger cannot overcome Defendants' qualified immunity as to the second element. Further, Steiger has not provided any evidence that the Defendants made deliberate or reckless falsehoods or fabricated evidence during the investigation. The Defendants turned their investigative file over to the Attorney General's office. That office's independent review of the case and decision to prosecute Steiger is evidence that a reasonable officer could have believed probable cause was present. Defendants's qualified immunity entitles them to judgment on the malicious prosecution claim.

### 2.

Next, Defendants argue that Steiger's claim alleging First Amendment retaliation is also barred by qualified immunity. To establish a claim for First Amendment retaliation, "a plaintiff must show that (1) he was participating in a constitutionally protected activity; (2) defendant's action injured plaintiff in a way 'likely [to] chill a person of ordinary firmness from' further participation in that activity; and (3) in part, plaintiff's constitutionally protected activity motivated defendant's adverse action." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998)). "Once a plaintiff raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts and defendant 'can demonstrate that it would have taken the same action in the absence of the protected activity.'" *Id.* (quoting *Arnett v. Myers*, 281

F.3d 552, 560–61 (6th Cir.2002)). The plaintiff can raise that inference through "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similar individuals." *Arnett*, 281 F.3d at 560–61.

However, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). If probable cause for the underlying criminal charge existed, that suggests that the "prosecution would have occurred even without a retaliatory motive." *Id.* at 261. Further, the plaintiff must show that the defendant "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* at 262. "Evidence of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor who would not have pressed charges otherwise." *Id.* at 263. Additionally, there is a "longstanding presumption . . . that a prosecutor has legitimate grounds for the action he takes." *Id.* In short, lack of probable cause must be "pleaded and proven" in order for a plaintiff to prevail on a First Amendment retaliatory prosecution claim under § 1983. *Id.* at 266; *Barnes v. Wright*, 449 F.3d 709, 719 (6th Cir. 2006).

Thus, Steiger cannot prevail on his retaliation claim. He asserts that the investigation and prosecution occurred as a result of the public statements he made criticizing various Defendants. But even if that is assumed to be true, Steiger cannot show that the prosecution was motivated by his public criticisms. As already discussed, there was sufficient evidence for a reasonable officer to believe that there was probable cause to believe Steiger had fraudulently obtained prescription drugs. Further, the Attorney General's independent decision to initiate the prosecution, based on its belief that probable cause existed, means that the charges would have occurred "even without

a retaliatory motive." *Hartman*, 547 U.S. at 261. Because Steiger cannot prove lack of probable cause, as required by *Hartman*, his First Amendment retaliation claim will be dismissed.

**3.**

Finally, Defendants argue that Steiger's claim for violation of his Fourteenth Amendment due process rights should be dismissed. Steiger argues that Defendants' actions constitute a violation of substantive due process. Only a narrow set of interests are protected by substantive due process. *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003). They include interests "protected by specific constitutional guarantees, . . . freedom from government actions that 'shock the conscience' and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." *Id.* (citing *Braley v. Pontiac*, 906 F.2d 220, 224–25 (6th Cir.1990)). *See also Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003). Steiger's arguments in support of his claim for violation of substantive due process merely reiterate his previous arguments that his investigation and prosecution was a malicious attempt by Defendants to retaliate against him for criticizing them. Because a reasonable officer could have found that probable cause existed to charge Steiger with the crime, the initiation of prosecution in this instance was not so arbitrary and capricious as to shock the conscience. Steiger's general and conclusory arguments that Defendants' actions violate substantive due process are insufficient to raise a genuine issue of material fact. His claim for violation of the Fourteenth Amendment will be dismissed.

**4.**

Steiger's only remaining claim is a state-law claim for gross negligence. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claims if they form part of the

same controversy as the federal claim. *See* 28 U.S.C. § 1367(a).  A federal court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002).  However, the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Because the issue is more appropriate for resolution in state court, Steiger's state law claim will be dismissed without prejudice.

## IV.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 43, is **GRANTED.**

It is further **ORDERED** that Counts I, II, III, and V of Plaintiff Steiger's complaint, ECF No. 1, are **DISMISSED with prejudice.**

It is further **ORDERED** that Count IV of Plaintiff Steiger's complaint, ECF No. 1, is

**DISMISSED without prejudice.**


Dated: September 30, 2016                         s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on September 30, 2016.

                              s/Kelly Winslow for
                              MICHAEL A. SIAN, Case Manager